**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CHARLES ROBINS,          )
a/k/a Ha'im Al Matin Sharif,   )    2:99-cv-0412-LRH-PAL
                       )
     Petitioner,       )
                       )    **ORDER**
vs.                    )
                       )
HOWARD SKOLNIK, *et al.*,   )
                       )
     Respondents.    )
                       )
                       )
_____/

Introduction

      This action is a petition for writ of habeas corpus by Charles Robins, a Nevada prisoner sentenced to death.  The action is before the court on a motion to dismiss (docket #143) filed by the respondents on January 8, 2010, a motion for evidentiary hearing (docket #171) filed by Robins on May 12, 2010, and a motion for leave to conduct discovery (docket #155) filed by Robins on April 26, 2010.  All three motions are fully briefed.  The court will grant the motion to dismiss in part and deny it in part, and will dismiss several of Robins' claims.  The court will deny the motion for evidentiary hearing and the motion for leave to conduct discovery.  The court will set a schedule for the respondents to answer the claims not dismissed.

Background[1]

      In its decision affirming Robins' conviction and sentence, the Nevada Supreme Court described the background facts, and Robins' trial, as follows:

> The evidence adduced at trial demonstrated a pattern of abusive treatment of eleven-month-old Brittany Smith (Brittany) by Robins, who was living with the child and her mother, Lovell McDowell. This abusive treatment by Robins ultimately resulted in the infant's untimely and brutally violent death.

> Several witnesses testified concerning Robins' abusive treatment of Brittany. Evidence indicated that Robins regularly punched and kicked Brittany. He often held his hand over her mouth and nose until she gasped for breath. On several occasions Robins held Brittany underwater in the bathtub until she came up gasping for breath. One witness observed an occasion when Robins caused the infant to turn blue from lack of breath. Robins frequently shut Brittany in a dark bathroom for several hours at a time. Once he was seen holding the infant over a second floor railing by her neck and shaking her. Other incidents of abuse by Robins included putting Brittany on the top shelf of a closet (some six feet above the floor), closing the door, and letting her fall to the floor. Robins would also force his finger down Brittany's throat and cause her to gag. One witness testified that Robins frequently repeated this abuse until the child could no longer gag and ceased crying.

> At one point Brittany suffered a broken leg, for which medical treatment was delayed. The child's fracture was evidenced by a painful knot on her leg. Initially, neither Robins nor the mother sought treatment for the infant; however, after the knot reappeared and became quite painful, Brittany was taken to the hospital. Radiographs revealed that Brittany's right femur was fractured and that callus had formed, which meant the fracture was from ten to fourteen days old. Moreover, an examination of the radiographs also showed the presence of a previous partially healed fracture that occurred ten to twenty days earlier. Brittany's condition required her placement in a body cast. A witness recounted seeing Robins swing Brittany by the cross-bar of her cast (the body cast extended from Brittany's waist down her legs, with a cross-bar between the legs).

> Over a period of time, several reports were received by the Las Vegas Metropolitan Police Department's (LVMPD) child abuse unit concerning Brittany. However, follow-up investigations failed to uncover the extent of the abuse in the home and no remedial action was ever taken. Brittany's mother, Lovell McDowell, was interviewed concerning the child's broken leg. McDowell falsely explained at the time that the injury was caused by babysitters, whose whereabouts in California were unknown.

> The events leading to Brittany's death occurred in the early morning hours of April 19, 1988. The details of that morning were supplied by several witnesses.

---

[1] This statement of the background of the case is set forth only to provide context for this order. The court does not intend, in this section of this order, to make any finding with respect to any disputed fact.

McDowell testified that on the night Brittany died, the child was sleeping and she and Robins finished eating around 12:30 a.m. Thereafter, she fell asleep but was soon awakened by sounds of gagging or choking. She hollered to Robins, "What's wrong with Brittany?" He responded, "nothing wrong." The mother arose and encountered Robins, who was holding Brittany, in the hallway. She then returned to the room to get Brittany a towel when she heard Robins hollering, "Brittany, come on. Brittany, wake up. Wake up Brittany." McDowell immediately dialed 911 and thereafter ran into the parking lot of their apartment complex, screaming that her baby had stopped breathing. An Air Force Sergeant heard the screams and sought to help the child by performing CPR. The security guard called the LVMPD and paramedics were also immediately summoned.

The paramedics rushed Brittany to the hospital where measures were taken to restore breathing and a heartbeat. The infant could not be revived, however, and was pronounced dead shortly after her arrival.

A LVMPD officer responding to a call met Robins outside the apartment at approximately 2:30 a.m. Robins was given a Miranda warning, following which he gave the officer a brief statement recounting the events of the evening. Later a homicide detective with the LVMPD was dispatched to Robins' apartment in reference to an infant's death. A taped statement was taken from Robins and following an investigation, Robins was arrested for Brittany's murder.

A medical examiner's autopsy investigation revealed a number of injuries, some of which were substantially more recent than others. The external exam revealed bruises under Brittany's jaw, bruises on the upper portion of her sternum and a number of bruises on her back. Additionally, there was a small hemorrhage in the left flank. The internal examination uncovered a number of injuries. First, there were multiple hemorrhages in the scalp on the left side and top of the head and there were bilateral subdural hemorrhages. The brain was swollen (a direct response to injury). Further internal examination of the abdominal and thoracic cavities revealed additional injuries. There were a number of hemorrhages in the mesentery (supporting connective tissue) of the intestines. Additionally, there was substantial internal scarring on the left side below the kidney. The scar tissue encased the ureter, and extended from the kidney down to the large intestine.

Dr. Hollander's microscopic examination of the scar tissue revealed numerous injuries. There were fresh hemorrhages, granulation tissue (the body's first reaction to injury in the healing process), and fibrous (scar) tissue which takes approximately six weeks from the initial injury to form. The medical examiner noted that Brittany's right femur showed signs of having been broken in the past. She had to reference Brittany's medical records to ascertain that the leg had been broken twice and was in the process of healing.

Finally, the autopsy revealed that Brittany had suffered a transverse separation of her eleventh thoracic vertebra (a broken back). It was the examiner's opinion that this injury was the result of substantial blunt force trauma that was administered less than twenty-four hours prior to Brittany's death.

In conclusion, the medical examiner opined that CPR, even if improperly performed, could not have caused Brittany's injuries. She was of the opinion that Brittany was a battered child and that death was by homicide.

3

Robins testified on his own behalf. He admitted doing many of the things testified to by the State's witnesses. However, he characterized his actions as rough play, to make Brittany tough. Incredibly, Robins stated that he had no intention of hurting Brittany.

Robins specifically denied ever picking Brittany up by the cross-bar of her body cast. He also denied putting his finger down Brittany's throat to gag her. He did admit to putting his fingers in Brittany's mouth in an effort to prevent her from spitting. Robins testified that he never hit Brittany in the face with his fists with or without jewelry on his hands and denied the existence of the bathtub incidents.

Robins admitted placing Brittany in the bathroom when she cried and company was present. His stated reason for doing so was to persuade her to stop crying. Robins also denied that he had ever picked the child up by her neck as charged by a State's witness. He said that he had picked her up by the arms. Again, he denied any intention of hurting the baby in any of these actions.

Robins also placed a benign connotation on Brittany's experience on the closet shelf. He stated that in an effort to teach Brittany not to crawl off the bed, he put her on the bottom shelf of the closet and allowed her to fall off that shelf. The shelf, according to Robins, was three and one-half inches above the floor. He denied ever placing Brittany on a closet shelf six feet above the floor.

Concerning the events on the night Brittany died, Robins testified in detail. He stated that he and McDowell had been engaged in a "romantic encounter," after which they fell asleep. Robins said he woke up and that following a telephone call, he and McDowell ordered pizza. Robins also stated that McDowell did not go to sleep after eating pizza, as she had testified. Robins said he told McDowell he was going to wake Brittany in order to check on her because she had been congested with a cold and had occasionally vomited.

After Brittany was awake, Robins said he played with her for a few minutes. McDowell called out, telling Robins not to be too long with Brittany. Eventually, Robins kissed Brittany and got up to leave when he heard Brittany cough twice and saw her start to spit up. He said Brittany was breathing rapidly and that he froze, waiting for her to snap out of it. According to Robins, Brittany just stopped breathing. Robins testified that at that point he panicked. He said he yelled, "Brittany, wake up. Brittany, wake up." In an effort to awaken her, Robins threw water in her face but she was still unresponsive. At that point he laid her back down and tried to apply CPR.

Robins spoke freely with the police and stated that he told them to the best of his knowledge what had occurred. Robins said he loved Brittany like a daughter, and while admitting to rough play, he denied any intention to hurt or kill Brittany. He admitted to being the last person to see Brittany conscious.

Five days following the return of guilty verdicts by the jury, the penalty hearing commenced. The State called several witnesses who described Robins as an extremely violent man. In particular, Robins had severely beaten a young man who was involved in Robins' drug sales. Robins had made numerous statements to friends and associates that he would kill a police officer. Finally, there was evidence that Robins had threatened to bomb the apartment where McDowell, Brittany and another

4

1   of McDowell's boyfriends were living. His stated purpose was to kill everyone in the
2   apartment. The police were called and the situation was peacefully resolved.

3       McDowell concluded her testimony during the penalty phase by relating, over
    defense counsel's objection, that her brother and uncle had received threatening notes
4   while she was in jail. Robins was also in jail when the notes were delivered.

5       Additionally, there was evidence indicating Robins was substantially involved
    in the sale of rock cocaine. Evidence of one of Robins' arrests for the sale of cocaine
6   was introduced. Robins objected to this testimony because charges were never filed.
    There was also some testimony tending to connect Robins with gangs.

7       In his defense, Robins called several witnesses. Generally, the tenor of the
    testimony concerned not seeing Robins abuse either Brittany or other children he had
8   been around, his general nature and non-violent personality.

9   *Robins v. State*, 106 Nev. 611, 614-18, 798 P.2d 558, 560-64 (1990), *cert. denied*, 499 U.S.

10  970 (1991).

11      Robins was convicted of felony child abuse with substantial bodily harm, and first degree

12  murder.  Exhibits R43, R47.[2]  For the child abuse, Robins was sentenced to 20 years in prison.

13  Exhibit R47.  For the murder, he was sentenced to death.  Exhibit R43.

14      Robins appealed.  Exhibit R48.  On September 19, 1990, the Nevada Supreme Court

15  affirmed the conviction and sentences.  Exhibit R65 (opinion published at *Robins v. State*,

16  106 Nev. 611, 798 P.2d 558 (1990), *cert. denied*, 499 U.S. 970 (1991)) (a copy of the decision is

17  located in the record at Exhibit R65).  On December 18, 1990, the Nevada Supreme Court denied

18  Robins' petition for rehearing.  Exhibits R66, R67.  Robins then petitioned the United Supreme

19  Court for certiorari, and that petition was denied on April 15, 1991.  Exhibit R71.  The Nevada

20  Supreme Court's remittitur issued on April 23, 1991.  Exhibit R72.

21      On July 5, 1991, Robins filed a petition for post-conviction relief in the state district court.

22  Exhibit R80, R87.  The state district court denied that petition on March 9, 1992.  Exhibit R97.

23  Robins appealed.  Exhibit R98.  On May 27, 1993, the Nevada Supreme Court remanded the case to

24  the district court for an evidentiary hearing.  Exhibit R112.  The evidentiary hearing was held on

25

26      [2]  Unless otherwise noted, exhibits identified in this order in the form "Exhibit R1, "
    "Exhibit R2," etc., were filed by respondents in support of their motion to dismiss, and are located
    in the record at docket #144 through #152.

January 31, February 20, March 6, March 13, and March 20, 1997.  Exhibits R140, R141, R145, R150, R152.  On March 6, 1997, while the evidentiary was pending, Robins filed, in the Nevada Supreme Court, a petition for writ of mandamus, seeking to expand the scope of the issues to be considered on remand, and seeking the admission of certain evidence at the evidentiary hearing.  Exhibit R147.  That petition was denied.  Exhibit R148.  On June 10, 1997, the state district court issued an order again denying Robins' petition for post-conviction relief.  Exhibit R153.

Robins again appealed.  Exhibit R154.  Back in the Nevada Supreme Court, Robins moved for another remand, so that other issues could be pursued at an evidentiary hearing.  Exhibits R158.  That motion was denied.  Exhibit R161.  Robins' motion for reconsideration of that ruling was also denied.  Exhibits R163, R165.  On November 24, 1998, the Nevada Supreme Court dismissed the appeal.  Exhibit R171.  On March 17, 1999, the Nevada Supreme Court denied a petition for rehearing.  Exhibits R175, R177.  The Nevada Supreme Court's remittitur issued on April 2, 1999.  Exhibit R178.[3]

On April 6, 1999, this court received from Robins a *pro se* habeas corpus petition (docket #5), initiating this action.  On September 9, 1999, Robins filed a supplement to his habeas petition (docket #7).

Robins was granted *in forma pauperis* status (docket #4, #5), and was appointed counsel (docket #4, #6, #8, #10, #12, #18, #19).  Robins then was granted leave to conduct discovery.  He filed his first motion for leave to conduct discovery on July 7, 2000 (docket #22); the court entered an order on April 3, 2001, granting that motion in part and denying it in part (docket #46).  Robins filed a second motion for leave to conduct discovery on August 20, 2001 (docket #56); the court granted that motion on December 18, 2001 (docket #62).  Robins filed a third motion for leave to conduct discovery on September 3, 2002 (docket #76); the court denied that motion on

---

[3] These state-court proceedings, between 1991 and 1999, are referred to in this order as Robins' "first state petition."

1   September 30, 2003 (docket #87).  On April 16, 2004, Robins filed an amended petition for writ of

2   habeas corpus (docket #91).

3        On August 30, 2004, respondents filed a motion to dismiss (docket #98).  Robins did not file

4   an opposition to the motion to dismiss, but, rather, on December 3, 2004, he filed a motion for a stay

5   (docket #101).  The court granted the motion for a stay (docket #104), and, on March 14, 2005, after

6   Robins filed a fully-exhausted second amended habeas petition (docket #105), the court stayed the

7   case, to allow Robins an opportunity to exhaust claims in state court (docket #106).

8        On May 11, 2005, Robins filed a petition for writ of habeas corpus in the state district court.

9   Exhibit R180.  The state district court denied that petition on September 18, 2006.  Exhibit R199.

10  Robins appealed.  Exhibit R200.  The Nevada Supreme Court affirmed on January 20, 2009.

11  Exhibit R228.  The court denied rehearing on May 19, 2009.  Exhibit R234.  The court's remittitur

12  issued on June 16, 2009.  Exhibit R235.[4]

13       On June 19, 2009, Robins moved to vacate the stay of this action (docket #125).  On

14  June 23, 2009, the stay was lifted and the case reopened (docket #126).  On September 22, 2009,

15  Robins filed a third amended petition for writ of habeas corpus (docket #133).  The third amended

16  petition contains 24 separate claims, which are referred to in this order as Grounds 1 through 24.

17       On January 8, 2010, the respondents filed a motion to dismiss (docket #143), asserting that

18  various of Robins' claims are untimely, unexhausted, and procedurally barred.  Robins responded to

19  that motion on May 12, 2010 (docket #168), and respondents replied on July 9, 2010 (docket #177).

20       On May 17, 2010, Robins filed a motion for an evidentiary hearing (docket #171).

21  Respondents filed an opposition to that motion on July 9, 2010 (docket #176).  Robins replied on

22  July 29, 2010 (docket #178).  On April 26, 2010, Robins filed a motion for leave to conduct

23  discovery (docket #155).   Respondents filed an opposition to that discovery motion on July 9, 2010

24  (docket #175).  Robins did not file a reply.

25

26       [4] These state-court proceedings, between 2005 and 2009, are referred to in this order as Robins'
    "second state petition."

7

The Motion to Dismiss

    A.    Statute of Limitations

    Respondents argue that the statute of limitations applicable to federal habeas corpus actions bars Grounds 9 through 24 of Robins' third amended habeas petition.

    On April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) went into effect. Pub.L. No. 104-132, 110 Stat. 1214-1226 (1996). The AEDPA made various amendments to the statutes controlling federal habeas corpus practice, one of which imposed a one-year statute of limitations on the filing of federal habeas corpus petitions. With respect to the statute of limitations, the habeas corpus statute provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

    For convictions that became final prior to the enactment of the AEDPA, a petitioner had until April 24, 1997, to file a federal habeas corpus petition. *Patterson v. Stewart*, 251 F.3d 1243, 1245-46 (9th Cir. 2001). That is the case here. Robins' conviction became final on April 15, 1991, when the United States Supreme Court denied petitioner's petition for a writ of certiorari, with respect to the ruling of the Nevada Supreme Court affirming his conviction and sentence. *See* Exhibit R71.

1    Therefore, without the benefit of any tolling, the limitations period applicable to Robins' federal

2    habeas corpus action would have expired on April 24, 1997.  *See Patterson*, 251 F.3d at 1245-46.

3             The AEDPA limitations period, however, is tolled while a "properly filed application" for

4    post-conviction or other collateral relief is pending before a state court.  28 U.S.C. § 2244(d)(2).

5    A "properly filed application" is one in which the "delivery and acceptance are in compliance with

6    the applicable laws and rules governing filings."  *Dictado v. Ducharme,* 244 F.3d 724, 726-27

7    (9th Cir. 2001) (quoting *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)).

8             Robins filed his first state petition in the state district court on July 5, 1991.  Exhibit R80,

9    R87.  That proceeding remained pending until the Nevada Supreme Court issued its remittitur on

10   April 2, 1999.  *See* Exhibit R178.  Robins did not pursue further state-court litigation until

11   May 11, 2005, when he filed his second state petition in the state district court.  *See* Exhibit R180.

12   Without the benefit of equitable tolling, then, the limitations period for Robins' federal habeas

13   petition expired on April 2, 2000.

14            Robins filed his original petition in this action (docket #5, filed May 5, 1999), and the

15   supplement to it (docket #7, filed September 9, 1999), before the AEDPA limitations period ran out.

16   However, his first amended petition (docket #91, filed April 16, 2004), his second amended petition

17   (docket #105, filed February 17, 2005), and his third amended petition (docket #133, filed

18   September 22, 2009) were all filed after the expiration of the AEDPA limitations period.  Therefore,

19   absent any equitable tolling, new claims added by Robins in his amended petitions could be

20   considered timely only if they relate back, under Federal Rule of Civil Procedure 15(c), to the date

21   of the filing of the original petition or the supplement to it.

22            In *Mayle v. Felix*, 545 U.S. 644 (2005), the Supreme Court held, in the context of federal

23   habeas corpus litigation, that "[s]o long as the original and amended petition state claims that are

24   tied to a common core of operative facts, relation back will be in order."  *Mayle*, 545 U.S. at 664.

25   However, "[a]n amended habeas petition ... does not relate back (and thereby escape AEDPA's

26   one-year time limit) when it asserts a new ground for relief supported by facts that differ in both

1    time and type from those the original pleading set forth." *Id*. at 650.  The *Mayle* decision instructed

2    that the phrase, "conduct, transaction, or occurrence," as used in Rule 15(c), is not synonymous with

3    "trial, conviction, or sentence." *Id*. at 656-64.  Therefore, if the core operative facts of a claim were

4    pled in Robins' original petition, or the supplement to it, and then the claim was later presented in

5    Robins' third amended petition, the claim will relate back under *Mayle*, and will not be barred by the

6    statute of limitations; on the other hand, if the core operative facts underlying a claim were pled for

7    the first time in the first, second, or third amended petition, without the benefit of equitable tolling,

8    the claim is barred by the statute of limitations.

9            Respondents argue that the operative facts of Grounds 9 through 24 of Robins' third

10   amended petition were not set forth in Robins' original petition or the supplement to that petition.

11   *See* Motion to Dismiss (docket #143), pp. 12-14.  Robins does not challenge respondents' relation-

12   back analysis regarding Grounds 9, 10, and 12 through 24.  The court has compared the various

13   versions of Robins' petition, and finds that the claims in Grounds 9, 10, and 12 through 24 of the

14   third amended petition do not relate back ,under *Mayle*, to his timely-filed original petition and

15   supplement, and are therefore barred by the statute of limitations, absent equitable tolling.

16           Robins challenges respondents' analysis of Ground 11, with respect to the accrual of the

17   claim.  *See* Amended Opposition to Motion to Dismiss (docket #168), pp. 14-24.  In Ground 11,

18   Robins claims that his constitutional rights were violated as a result of "the State's failure to disclose

19   material impeachment evidence regarding benefits received by the key prosecution witnesses."

20   Third Amended Petition, p. 81.  Robins argues that, because the State withheld information

21   concerning alleged benefits conferred on the witnesses, his discovery of the factual basis for the

22   claim, and the accrual of the claim, were delayed.  Amended Opposition to Motion to Dismiss,

23   pp. 14-24.  This argument, however, is without merit.  Robins does not state with any specificity

24   how or when he first discovered the factual basis for Ground 11.  *See id*.  And, at any rate, it is clear

25   from the record that the discovery occurred no later than September 3, 2002; on that date, Robins

26   filed his third motion for leave to conduct discovery, and set forth the Ground 11 claim in some

detail in that motion.  *See* Third Motion for Leave to Conduct Discovery (docket #76), pp. 10-39.

Plainly, then, sometime prior to September 3, 2002, Robins had discovered the factual basis for

Ground 11.  However, even after that date, Robins waited another 19 months before filing an

amended petition setting forth the claim in Ground 11.  *See* Amended Petition for Writ of Habeas

Corpus (docket #91), pp. 74-90. Robins delayed for well over a year, after discovering the factual

basis for the claim, and therefore after the latest arguable accrual of the claim in Ground 11.

Therefore, the court finds that Grounds 9 through 24 of Robins' third amended habeas

petition were first asserted after the expiration of the AEDPA limitations period, do not relate back

to the filing of a timely petition, and, without the benefit of equitable tolling, are barred by the

statute of limitations.

The AEDPA statute of limitations is subject to equitable tolling.  *Holland v. Florida*,

--- U.S. ----, 130 S.Ct. 2549, 2562 (2010).  The petitioner bears the burden of showing that equitable

tolling is appropriate.  *Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 (9th Cir. 2005).  The

petitioner must establish:  "(1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way and prevented timely filing."  *Holland*, 130 S.Ct. at

2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted).

The application of equitable tolling is "highly fact-dependent." *Espinoza-Matthews*, 432 F.3d at

1026; *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000); *see also Holland*, 130 S.Ct. at

2565 ("often fact-intensive").  "[T]he threshold necessary to trigger equitable tolling ... is very

high, lest the exceptions swallow the rule."  *Waldron-Ramsey v. Pacholke,* 556 F.3d 1008, 1011

(9th Cir.2009) (quoting *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir.2002), and *United States v.*

*Marcello*, 212 F.3d 1005, 1010 (7th Cir.2000)).

Robins argues that he should receive the benefit of equitable tolling "because material

changes in the legal landscape of habeas corpus resulted in his failure to file an amended petition."

Amended Opposition to Motion to Dismiss, p. 6.  Specifically, Robins points to the changes made

by *Mayle*, in 2005, with respect to Federal Rule of Civil Procedure 15(c) and the relation back of

amended pleadings to earlier pleadings with respect to compliance with the statute of limitations. *See id.* at pp. 7-11.  Robins suggests that he could have, but did not, earlier seek to amend his petition to set forth the claims in Grounds 9 through 24, because of the Ninth Circuit Court of Appeals' construction of Rule 15(c), in habeas cases, prior to *Mayle.*  However, Robins does not explain why, allegedly relying on the pre-*Mayle* law, he chose to withhold these claims and not assert them sooner.  This is not the sort of extraordinary circumstance – *preventing timely filing* – that would justify equitable tolling.  There was no extraordinary circumstance *preventing* Robins from asserting Grounds 9 through 24 in a timely manner.

Robins also argues that the court's scheduling orders lulled him into delaying the assertion of Grounds 9 through 24 in an amended petition.  The court finds this argument to be without merit as well.  The scheduling orders set deadlines for certain activities in the case, including the filing of an amended petition; the scheduling orders did not *prevent* the earlier filing of an amended petition, and the scheduling orders did not have any effect at all on the running of the statute of limitations.  *See, e.g.,* First Scheduling Order (docket #11); Second Scheduling Order (docket #20).  Robins has not pointed to any language in the court's scheduling orders that allegedly misled him with respect to the operation of the statute of limitations.

Robins is not entitled to equitable tolling.  Grounds 9 through 24 were first asserted well after the expiration of the AEDPA limitations period, and did not relate back to the filing of a timely petition.  Grounds 9 through 24 will, therefore, be dismissed on statute of limitations grounds.[5]

B.   Exhaustion

A federal court may not grant relief on a habeas corpus claim not exhausted in state court. 28 U.S.C. § 2254(b).  The exhaustion doctrine is based on the policy of federal-state comity, and is designed to give state courts the initial opportunity to correct alleged constitutional deprivations. *See Picard v. Conner*, 404 U.S. 270, 275 (1971).  To exhaust a claim, a petitioner must fairly present

---

[5] Grounds 9 through 24 are also barred by the procedural default doctrine, as is discussed *infra*, and those claims are dismissed on that ground as well.

12

the claim to the State's highest court, and must give that court the opportunity to address and resolve it.  *See Duncan v. Henry*, 513 U.S. 364, 365 (1995)(*per curiam*); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

Respondents argue that Grounds 9, 10, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, and 24, of Robins' third amended habeas petition, are unexhausted.[6]

The claims in Grounds 9 through 24 were asserted in Robins' second state petition.  *See* Exhibit R180.  Those claims were denied by the state district court, on procedural grounds.  *See* Exhibit R199.  Robins appealed that ruling, and it was affirmed on appeal.  *See* Exhibits R217, R228.  Therefore, Grounds 9 through 24 are exhausted.  However, as is discussed elsewhere in this order, those claims are barred by both the statute of limitations and the procedural default doctrine.

C.      Procedural Default

Respondents contend that the doctrine of procedural default precludes this court from considering the merits of Grounds 9 through 24.

A federal court generally will not review a claim for habeas corpus relief if the decision of the state court denying the claim rested on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991).  The Court in *Coleman* stated the effect of a procedural default as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

A state procedural bar is "independent" if the state court explicitly invokes the procedural rule as a separate basis for its decision.  *McKenna v. McDaniel*, 65 F.3d 1483, 1488 (9th Cir.1995).

---

[6] In their motion to dismiss, respondents also argued that Ground 8 is unexhausted.  Motion to Dismiss, pp. 16-17.  However, respondents withdrew that argument in their reply.  Reply, p. 14.

The state procedural bar is not independent if the application of the procedural rule depends on a consideration of federal law. *Park v. California*, 202 F.3d 1146, 1152 (9th Cir.2000).

A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. United States Dist. Court* (*Bean*), 96 F.3d 1126, 1129 (9th Cir.1996) (citation and internal quotation marks omitted).

Robins asserted the claims in Grounds 9 through 24 in his second state petition. *See* Exhibit R180. The state district court denied each of those claims on procedural grounds. *See* Exhibit R199. Specifically, the state district court ruled that those claims were barred by the statute of limitations under NRS 34.726, barred by the laches doctrine under NRS 34.800, and barred as a second or successive petition under NRS 34.810(1)(b)(2). *See id.* Robins appealed that ruling, and it was affirmed on appeal. *See* Exhibits R217, R228.

With respect to the claims in Grounds 9, 10, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, and 24, the Nevada Supreme Court did not at all discuss the merits of the claims in affirming their denial on procedural grounds. *See* Exhibit R228. The denial of those claims was clearly based on independent state procedural grounds.

With respect to the claims in Grounds 11 and 16, the Nevada Supreme Court did include, in its ruling, some discussion of the merits of the claims, in the context of cause and prejudice analyses. *See* Exhibit R228, p. 8 (regarding the claim in Ground 11) and p. 10 (regarding the claim in Ground 16). The discussion of the merits of a claim in a cause and prejudice analysis, however, is part of the application of the procedural rule, and does not show inadequacy of that procedural rule. *See Moran v. McDaniel*, 80 F.3d 1261, 1269 (9th Cir.1996). The Nevada Supreme Court's denial of the claims in Grounds 11 and 16, then, was independent, for purposes of application of the procedural default doctrine.

Robins next argues that the procedural bars imposed by the Nevada courts are not adequate to preclude federal habeas review. *See* Amended Opposition to Motion to Dismiss, pp. 31-37.

1     In *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir.2003), the court of appeals announced a

2    burden-shifting regime to be applied in analyzing the adequacy of a state procedural bar.  Under

3    *Bennett*, the State carries the initial burden of adequately pleading "the existence of an independent

4    and adequate state procedural ground as an affirmative defense."  *Bennett*, 322 F.3d at 586.  The

5    burden then shifts to the petitioner "to place that defense in issue," which the petitioner may do

6    "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure,

7    including citation to authority demonstrating inconsistent application of the rule."  *Id.*  If the

8    petitioner meets this burden, "the ultimate burden" of proving the adequacy of the procedural bar

9    rests with the State, which must demonstrate "that the state procedural rule has been regularly and

10    consistently applied in habeas actions."  *Id.*

11     The respondents, in their motion to dismiss, pled the existence of independent and adequate

12    state procedural grounds, with respect to the state courts' denials of the claims in Grounds 9 through

13    24, and by doing so, met their initial burden under *Bennett*.  Motion to Dismiss, p. 19.

14     In his response to the motion to dismiss, Robins claims that the state courts have not

15    consistently applied the procedural rules in NRS 34.726, NRS 34.800, and NRS 34.8180.  Amended

16    Opposition to Motion to Dismiss, pp. 31-37.  Robins cites cases that he believes illustrate that the

17    Nevada courts did not, around the time of his default, consistently apply the procedural rules at

18    issue.  *Id.*  While the court does not find Robins' showing to be especially compelling, the court does

19    find that Robins has put the procedural default defense at issue, and has thereby met his burden

20    under *Bennett*.  The burden, then, shifts to the respondents, to show the adequacy of the procedural

21    bar, by demonstrating that the procedural rules in NRS 34.726, NRS 34.800, and NRS 34.810 have

22    been regularly and consistently applied.  *See Bennett*, 322 F.3d at 586.

23     The Ninth Circuit has instructed that the court's past determinations as to the adequacy of a

24    procedural rule for a given time period are to be accorded deference in applying the *Bennett*

25    analysis.  In *King v. Lamarque*, the court held as follows:

26

In *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir.1998), we held that a petitioner had not met his burden because we had already held the state procedural rule to be consistently applied and the petitioner failed to cite cases demonstrating subsequent inconsistent application. *Id.* at 932. This holding helps prevent inconsistent determinations regarding a state procedural rule's adequacy during a given time period. This same reasoning provides a firm foundation for applying the *Ortiz* requirement bilaterally. Once we have found a state procedural rule to be inadequate, petitioners may fulfill their burden under *Bennett* by simply challenging the adequacy of the procedure; the burden then shifts back to the government to demonstrate that the law has subsequently become adequate. . . .

This holding is necessary to maintain the primary principle we announced in *Bennett*: the government bears the ultimate burden of establishing the adequacy of a rule. This burden should exist whether or not the petitioner identifies the correct basis upon which to challenge the adequacy of the rule. If we held otherwise, the government could avoid its burden under *Bennett*, and illogical results would occur. Here, for example, we would bar King's claim based on a procedural rule already found to be inadequate.  In essence, we would be holding that the same rule is adequate in some cases and inadequate in others. This defies common sense. A procedural rule is either adequate or inadequate during a given time period; its adequacy does not depend upon the facts of a petitioner's case.

*King v. Lamarque*, 464 F.3d 963, 967-68 (9th Cir.2006) (emphasis added).  Thus, as the court of appeals instructed in *King*, this court defers to the court of appeals' rulings with respect to the adequacy of Nevada's procedural bars around the time of Robins' default.

Robins' default in state court occurred on July 5, 1991, when Robins filed his timely first state petition without raising the claims now stated in Grounds 9 through 24.  *See Valerio v. Crawford*, 306 F.3d 742, 776 (9th Cir.2002) (*en banc*), *cert. denied*, 538 U.S. 994 (2003) ("The procedural default, if any, occurred at this time because Valerio omitted the claims from his Chapter 177 petition, and it is the consequence of this omission that is in dispute.").[7]

The Ninth Circuit Court of Appeals has held the statute of limitations codified at NRS 34.726 to be adequate to preclude federal habeas review.  In *Moran*, a capital case, the court of appeals ruled that, as of 1996, the Nevada Supreme Court consistently applied the statute of limitations set forth in NRS 34.726, as well as the laches doctrine codified in NRS 34.800.

---

[7]  Robins asserts that, with respect to NRS 34.726, his default occurred on January 1, 1994, one year after NRS 34.726 was enacted.  *See* Reply in Support of Motion for Evidentiary Hearing (docket #178), pp. 5-6.  This is a reasonable alternative view of the date of the NRS 34.726 default. Using January 1, 1994, as the date of default, however, would not significantly change the analysis and would not change the outcome.

16

*See Moran*, 80 F.3d at 1269-70; *see also Valerio,* 306 F.3d at 778 (discussing holding in *Moran*). Similarly, in *Loveland v. Hatcher*, 231 F.3d 640, 642-44 (9th Cir.2000), also a capital case, the court of appeals ruled that, as of 1993, the Nevada Supreme Court consistently applied the statute of limitations in NRS 34.726.

With respect to the adequacy of the procedural rule codified in NRS 34.810, which essentially states that a claim is waived if not raised in earlier legal proceedings, the legal landscape is more complicated.  In *McKenna v. McDaniel*, 65 F.3d 1483 (9th Cir.1995), a capital case, the court of appeals considered NRS 177.375, a procedural rule substantially similar to that in NRS 34.810, and held that the Nevada courts had not applied that rule consistently as of 1985. *See McKenna*, 65 F.3d at 1488-89; *see also Moran,* 80 F.3d at 1270 (9th Cir.1996) (discussing *McKenna*).  In the capital case of *Petrocelli v. Angelone*, 248 F.3d 877 (9th Cir.2001), the court of appeals held that the NRS 34.810 procedural rule was inadequate as of 1985.  *See Petrocelli*, 248 F.3d at 887-88.  And, later, in *Valerio*, the court held that the procedural bar under NRS 34.810, for failure to raise claims in earlier state-court habeas proceedings, was inadequate as of 1990.  *See also Sechrest v. Ignacio,* 549 F.3d 789, 802-03 (9th Cir.2008) (following *Valerio,* and holding that the procedural rule in NRS 34.810 was inadequate as of 1985).

The court considers unpublished as well as published decisions of the Nevada Supreme Court to determine whether that court had, "in actual practice, a clear, consistently applied, and well-established rule at the time of [petitioner's] purported default." *Powell v. Lambert*, 357 F.3d 871, 872 (9th Cir.2004) (internal quotation marks omitted).  A rule need not be applied in every case to be considered consistently applied; however, it must be applied in the "vast majority of cases." *Dugger v. Adams*, 489 U.S. 401, 410-11 n. 6 (1989).

In *Bennett*, the Court of Appeals indicated that the scope of the state's "ultimate burden" would depend on the nature and depth of the petitioner's allegations of inadequacy.  *Bennett*, 322 F.3d at 584-85 (quoting *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir.1999)).

1    Respondents cite a number of unpublished and published opinions in which the Nevada

2  Supreme Court enforced procedural defaults in capital cases around the time of Robins' default.

3  *See* Reply, pp. 18-20.  Those opinions reinforce the rulings of the Ninth Circuit Court of Appeals, in

4  *Moran* and *Loveland*, that, in the early 1990's the Nevada courts consistently applied the statute of

5  limitations of NRS 34.726 and the laches doctrine of NRS 34.800.  The court concludes that, in light

6  of *Moran* and *Loveland*, and according those decisions deference as instructed in *King*, respondents

7  have carried their burden, and have shown the procedural rules in NRS 34.726 and NRS 34.800 to

8  be adequate to support a procedural default in this action.

9    On the other hand, keeping in mind the holdings in *McKenna*, *Petrocelli*, *Valerio*, and

10  *Sechrest*, and affording those rulings the deference mandated under *King*, the court concludes that

11  respondents have not shown the procedural rule in NRS 34.810 to have been adequate to support a

12  procedural default in the early 1990's, when Robins' default occurred.  The inadequacy of the

13  procedural rule in NRS 34.810 is of no effect here, however, as all of the claims at issue – the claims

14  in Grounds 9 through 24 – were held by the Nevada Supreme Court to be defaulted under all three

15  statutes, NRS 34.726, NRS 34.800, and NRS 34.810.  *See* Exhibit R228, p. 3.  Therefore, while

16  NRS 34.810 was not adequate to support a procedural default in this case, NRS 34.726 and

17  NRS 34.800 were adequate, and Robins defaulted his claims in Grounds 9 through 24 under each of

18  those statutes.

19    Robins argues that he can show "cause" for the procedural default.  *See* Amended Opposition

20  to Motion to Dismiss, p. 31.   Specifically, he asserts that there is cause, "due to the failure of the

21  habeas court to comply with former Nev. Rev. Stat. § 177.380(3), repealed, 1991 Nev. Stats. ch. 44,

22  which required the court to admonish the petitioner and counsel that all claims must be raised in an

23  initial post-conviction proceeding."  *Id*.  To demonstrate cause for a procedural default, the

24  petitioner must show that "some objective factor external to the defense impeded" his efforts to

25  comply with the state procedural rule.  *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th Cir.2004)

26  (quoting *Pizzuto v. Arave*, 280 F.3d 949, 975 (9th Cir.2002), and *Murray v. Carrier*, 477 U.S. 478,

488 (1986)); *see also McClesky v. Zant*, 499 U.S. 467, 497 (1991) ("For cause to exist, the external

impediment, whether it be government interference or the reasonable unavailability of the factual

basis for the claim, must have prevented petitioner from raising the claim.").  Robins makes no

showing that he was impeded or prevented from raising his claims by the alleged failure of the

Nevada courts to comply with the Nevada statute, and warn him that he must raise all his claims in

his first state petition.  Moreover, Robins does not even address the question of "prejudice."

*See* Amended Opposition to Motion to Dismiss, p. 31.

Robins also argues that it would amount to a fundamental miscarriage of justice for this

court not to consider certain of his claims.  *See* Amended Opposition to Motion to Dismiss,

pp. 24-31.  In order to make such a showing, Robins must establish that the constitutional error

complained of probably resulted in the conviction of an actually innocent person.  *Schlup v. Delo*,

513 U.S. 298, 327-328 (1995); *McClesky*, 499 U.S. at 494 ("These are extraordinary instances when

a constitutional violation probably has caused the conviction of one innocent of the crime.");

*Murray*, 477 U.S. at 496; *Harris v. Vasquez*, 949 F.2d 1497, 1515 (9th Cir.1990); *see also Bousley v.*

*United States*, 523 U.S. 614, 623 (1998) ( "Actual innocence means factual innocence, not mere

legal insufficiency.").  Here, Robins focuses on Grounds 1, 7, and 8, arguing that, but for the

constitutional errors alleged in those claims, no reasonable juror would have found him guilty of

murder, or eligible for the death penalty.  *See* Amended Opposition to Motion to Dismiss, pp. 24-31.

Robins' argument in this regard is off the mark, however, as respondents do not assert that any of

Grounds 1, 7, and 8 is procedurally defaulted.  Robins makes no showing that dismissing Grounds 9

through 24, as procedurally defaulted, will amount to a miscarriage of justice.

Therefore, the court finds Grounds 9 through 24 to be procedurally defaulted, and those

claims will be dismissed on that ground.[8]

---

[8] Grounds 9 through 24 are also barred by the statute of limitations, as is discussed *supra*, and those claims are dismissed on that ground as well.

1   The Motion for an Evidentiary Hearing

2       Robins filed a motion for evidentiary hearing (docket #171).  Respondents filed an

3   opposition to that motion (docket #176), and Robins replied (docket #178).

4       Robins requests an evidentiary hearing with regard to the procedural bars affecting

5   Grounds 9 through 24 of his petition.  Robins requests an evidentiary hearing "to show that

6   Nevada's procedural default rules are not clearly established and adequate to bar federal habeas

7   review of his constitutional claims," "to prove the allegations of cause and prejudice contained in his

8   amended opposition to the State's motion to dismiss," "to develop the allegations [of] cause and

9   prejudice, that he is actually innocent of first degree murder and the application of the death penalty,

10  that he acted diligently in pursuing the factual basis of his *Brady* claim, and that he is entitled to

11  equitable tolling of the statute of limitations based upon the uncertainty in the law governing

12  amended petitions, his good faith reliance upon this Court's scheduling orders, and that any 'delay'

13  in litigation is not attributable to Mr. Robins."  Amended Motion for Evidentiary Hearing (docket

14  #171), pp. 2-3.

15      Robins, however, has not shown that he would have any possibility of overcoming the statute

16  of limitations or procedural default bar if granted an evidentiary hearing.  In his motion, Robins did

17  not state in any detail at all – beyond the very general descriptions above – what factual issues

18  should be the subject of an evidentiary hearing.  Nor did Robins describe what evidence he wishes to

19  present at an evidentiary hearing.

20      In his reply, in support of his motion for an evidentiary hearing, Robins focuses only on his

21  request for an evidentiary hearing on the question of the adequacy of the state procedural bars

22  precluding this court's adjudication of Grounds 9 through 24 on their merits.  *See* Reply in Support

23  of Motion for Evidentiary Hearing (docket #178).   Robins does not explain, however, and this court

24  cannot discern, what Robins could possibly present at an evidentiary hearing on the adequacy issue.

25  *See Bennett*, 322 F.3d at 584 (The adequacy analysis "should be limited to the language of the state

26

1  court opinions" rather than "based on a *post hoc* examination of the pleadings and record" in the

2  cases reviewed.).

3          The court will deny Robins' motion for evidentiary hearing.

4  <u>The Motion for Leave to Conduct Discovery</u>

5          Robins also filed a motion for leave to conduct discovery (docket #155).  Respondents filed

6  an opposition to that motion (docket #175), and Robins did not reply.

7          In the discovery motion, Robins requests leave to conduct discovery regarding Ground 11.

8  In Ground 11, Robins claims that his constitutional rights were violated as a result of "the State's

9  failure to disclose material impeachment evidence regarding benefits received by the key

10  prosecution witnesses."  Third Amended Petition, p. 81.   In the discovery motion, Robins seeks

11  discovery going to the merits of Ground 11.

12          Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts states:

13  "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of

14  Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good

15  cause shown grants leave to do so, but not otherwise."  The Supreme Court has provided guidance

16  regarding the manner in which a district court's discretion is to be exercised on Rule 6 motions.  The

17  Supreme Court has instructed that if through "specific allegations before the court," the petitioner

18  can "show reason to believe that the petitioner may, if the facts are fully developed, be able to

19  demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities

20  and procedures for an adequate inquiry."  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (*quoting*

21  *Harris v. Nelson*, 394 U.S. 286,  300 (1969)).

22          As is discussed above, Ground 11 is barred by the statute of limitations and by the procedural

23  default doctrine, and Ground 11 will be dismissed on those bases.  Robins does not explain any way

24  in which the requested discovery could help Robins overcome the statute of limitations and

25  procedural default bars.

26

Because Ground 11 is procedurally barred, and must be dismissed on statute of limitations and procedural default grounds, Robins cannot make a showing of good cause for this discovery, under Rule 6 and *Bracy*.  The court will, therefore, deny this discovery, which goes to the merits of a claim to be dismissed on procedural grounds.

**IT IS THEREFORE ORDERED** that respondents' Motion to Dismiss (docket #143) is **GRANTED IN PART AND DENIED IN PART**, as follows.

**IT IS FURTHER ORDERED** that the motion to dismiss is denied with respect to the following claims in petitioner's Third Amended Petition for Writ of Habeas Corpus (docket #133): Grounds 1, 2, 3, 4, 5, 6, 7, and 8.  The motion to dismiss is granted with respect to the following claims in the third amended petition: Grounds 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24.  Grounds 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24, of the third amended petition, are **DISMISSED**.

**IT IS FURTHER ORDERED** that petitioner's Amended Motion for Evidentiary Hearing (docket #171) is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner's Motion for Leave to Conduct Discovery (docket #155) is **DENIED**.

**IT IS FURTHER ORDERED** that respondents shall have **90 days** from the date of entry of this order to file and serve an answer, responding to Grounds 1, 2, 3, 4, 5, 6, 7, and 8 of petitioner's third amended petition.  In all other respects, the schedule for further proceedings in this case will be governed by the scheduling order entered July 7, 2009 (docket #130).

Dated this 11th day of August, 2010.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

22