1

2

3

4

5                          **UNITED STATES DISTRICT COURT**

6                              **DISTRICT OF NEVADA**

7

8    CHARLES ROBINS,                      )
     a/k/a Ha'im Al Matin Sharif,         )        2:99-cv-0412-LRH-PAL
9                                         )
            Petitioner,                   )
10                                        )        **ORDER**
     vs.                                  )
11                                        )
     RENEE BAKER, *et al.*,               )
12                                        )
            Respondents.                  )
13                                        )
                                          )
14   _____/

15

16   Introduction

17        This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254,

18   by Charles Robins, a Nevada prisoner sentenced to death.  Robins' convictions and death sentence

19   result from the death of eleven-month-old Brittany Smith in Las Vegas in the early morning of

20   April 19, 1988.  Robins was convicted of child abuse and murder, and was sentenced to a 20-year

21   prison sentence for the child abuse and to death for the murder.

22        The case is now before this court with regard to a motion by Robins for leave to file a fourth

23   amended habeas petition (ECF No. 262) and a motion for stay and abeyance (ECF No. 268).  The

24   court will grant both motions, allowing the amendment of Robins' habeas petition, and staying the

25   case pending Robins' exhaustion of claims in state court.

26

1   <u>Background Facts and Procedural History</u>

2       The Nevada Supreme Court, in its 1990 decision affirming Robins' conviction and sentence,

3   described the facts of the case, in light of the evidence at trial, as follows:

4           The evidence adduced at trial demonstrated a pattern of abusive treatment of
        eleven-month-old Brittany Smith (Brittany) by Robins, who was living with the child
5       and her mother, Lovell McDowell.  This abusive treatment by Robins ultimately
        resulted in the infant's untimely and brutally violent death.

6
            Several witnesses testified concerning Robins' abusive treatment of Brittany.
7       Evidence indicated that Robins regularly punched and kicked Brittany.  He often held
        his hand over her mouth and nose until she gasped for breath.  On several occasions
8       Robins held Brittany underwater in the bathtub until she came up gasping for breath.
        One witness observed an occasion when Robins caused the infant to turn blue from
9       lack of breath.  Robins frequently shut Brittany in a dark bathroom for several hours
        at a time.  Once he was seen holding the infant over a second floor railing by her neck
10      and shaking her.  Other incidents of abuse by Robins included putting Brittany on the
        top shelf of a closet (some six feet above the floor), closing the door, and letting her
11      fall to the floor.  Robins would also force his finger down Brittany's throat and cause
        her to gag.  One witness testified that Robins frequently repeated this abuse until the
12      child could no longer gag and ceased crying.

13          At one point Brittany suffered a broken leg, for which medical treatment was
        delayed.  The child's fracture was evidenced by a painful knot on her leg.  Initially,
14      neither Robins nor the mother sought treatment for the infant; however, after the knot
        reappeared and became quite painful, Brittany was taken to the hospital. Radiographs
15      revealed that Brittany's right femur was fractured and that callus had formed, which
        meant the fracture was from ten to fourteen days old.  Moreover, an examination of
16      the radiographs also showed the presence of a previous partially healed fracture that
        occurred ten to twenty days earlier.  Brittany's condition required her placement in a
17      body cast.  A witness recounted seeing Robins swing Brittany by the cross-bar of her
        cast (the body cast extended from Brittany's waist down her legs, with a cross-bar
18      between the legs).

19          Over a period of time, several reports were received by the Las Vegas
        Metropolitan Police Department's (LVMPD) child abuse unit concerning Brittany.
20      However, follow-up investigations failed to uncover the extent of the abuse in the
        home and no remedial action was ever taken.  Brittany's mother, Lovell McDowell,
21      was interviewed concerning the child's broken leg.  McDowell falsely explained at
        the time that the injury was caused by babysitters, whose whereabouts in California
22      were unknown.

23          The events leading to Brittany's death occurred in the early morning hours of
        April 19, 1988.  The details of that morning were supplied by several witnesses.
24      McDowell testified that on the night Brittany died, the child was sleeping and she and
        Robins finished eating around 12:30 a.m.  Thereafter, she fell asleep but was soon
25      awakened by sounds of gagging or choking.  She hollered to Robins, "What's wrong
        with Brittany?"  He responded, "nothing wrong."  The mother arose and encountered
26      Robins, who was holding Brittany, in the hallway.  She then returned to the room to
        get Brittany a towel when she heard Robins hollering, "Brittany, come on. Brittany,

2

1  wake up. Wake up Brittany." McDowell immediately dialed 911 and thereafter ran
2  into the parking lot of their apartment complex, screaming that her baby had stopped
   breathing. An Air Force Sergeant heard the screams and sought to help the child by
3  performing CPR. The security guard called the LVMPD and paramedics were also
   immediately summoned.

4      The paramedics rushed Brittany to the hospital where measures were taken to
5  restore breathing and a heartbeat. The infant could not be revived, however, and was
   pronounced dead shortly after her arrival.

6      A LVMPD officer responding to a call met Robins outside the apartment at
   approximately 2:30 a.m. Robins was given a Miranda warning, following which he
7  gave the officer a brief statement recounting the events of the evening. Later a
   homicide detective with the LVMPD was dispatched to Robins' apartment in
8  reference to an infant's death. A taped statement was taken from Robins and
   following an investigation, Robins was arrested for Brittany's murder.
9
       A medical examiner's autopsy investigation revealed a number of injuries,
10 some of which were substantially more recent than others. The external exam
   revealed bruises under Brittany's jaw, bruises on the upper portion of her sternum and
11 a number of bruises on her back. Additionally, there was a small hemorrhage in the
   left flank. The internal examination uncovered a number of injuries. First, there were
12 multiple hemorrhages in the scalp on the left side and top of the head and there were
   bilateral subdural hemorrhages. The brain was swollen (a direct response to injury).
13 Further internal examination of the abdominal and thoracic cavities revealed
   additional injuries. There were a number of hemorrhages in the mesentery
14 (supporting connective tissue) of the intestines. Additionally, there was substantial
   internal scarring on the left side below the kidney. The scar tissue encased the ureter,
15 and extended from the kidney down to the large intestine.

16     Dr. Hollander's microscopic examination of the scar tissue revealed numerous
   injuries. There were fresh hemorrhages, granulation tissue (the body's first reaction
17 to injury in the healing process), and fibrous (scar) tissue which takes approximately
   six weeks from the initial injury to form. The medical examiner noted that Brittany's
18 right femur showed signs of having been broken in the past. She had to reference
   Brittany's medical records to ascertain that the leg had been broken twice and was in
19 the process of healing.

20     Finally, the autopsy revealed that Brittany had suffered a transverse separation
   of her eleventh thoracic vertebra (a broken back). It was the examiner's opinion that
21 this injury was the result of substantial blunt force trauma that was administered less
   than twenty-four hours prior to Brittany's death.
22
       In conclusion, the medical examiner opined that CPR, even if improperly
23 performed, could not have caused Brittany's injuries. She was of the opinion that
   Brittany was a battered child and that death was by homicide.
24
       Robins testified on his own behalf. He admitted doing many of the things
25 testified to by the State's witnesses. However, he characterized his actions as rough
   play, to make Brittany tough. Incredibly, Robins stated that he had no intention of
26 hurting Brittany.

3

Robins specifically denied ever picking Brittany up by the cross-bar of her body cast. He also denied putting his finger down Brittany's throat to gag her. He did admit to putting his fingers in Brittany's mouth in an effort to prevent her from spitting. Robins testified that he never hit Brittany in the face with his fists with or without jewelry on his hands and denied the existence of the bathtub incidents.

Robins admitted placing Brittany in the bathroom when she cried and company was present. His stated reason for doing so was to persuade her to stop crying. Robins also denied that he had ever picked the child up by her neck as charged by a State's witness. He said that he had picked her up by the arms. Again, he denied any intention of hurting the baby in any of these actions.

Robins also placed a benign connotation on Brittany's experience on the closet shelf. He stated that in an effort to teach Brittany not to crawl off the bed, he put her on the bottom shelf of the closet and allowed her to fall off that shelf. The shelf, according to Robins, was three and one-half inches above the floor. He denied ever placing Brittany on a closet shelf six feet above the floor.

Concerning the events on the night Brittany died, Robins testified in detail. He stated that he and McDowell had been engaged in a "romantic encounter," after which they fell asleep. Robins said he woke up and that following a telephone call, he and McDowell ordered pizza. Robins also stated that McDowell did not go to sleep after eating pizza, as she had testified. Robins said he told McDowell he was going to wake Brittany in order to check on her because she had been congested with a cold and had occasionally vomited.

After Brittany was awake, Robins said he played with her for a few minutes. McDowell called out, telling Robins not to be too long with Brittany. Eventually, Robins kissed Brittany and got up to leave when he heard Brittany cough twice and saw her start to spit up. He said Brittany was breathing rapidly and that he froze, waiting for her to snap out of it. According to Robins, Brittany just stopped breathing. Robins testified that at that point he panicked. He said he yelled, "Brittany, wake up. Brittany, wake up." In an effort to awaken her, Robins threw water in her face but she was still unresponsive. At that point he laid her back down and tried to apply CPR.

Robins spoke freely with the police and stated that he told them to the best of his knowledge what had occurred. Robins said he loved Brittany like a daughter, and while admitting to rough play, he denied any intention to hurt or kill Brittany. He admitted to being the last person to see Brittany conscious.

Five days following the return of guilty verdicts by the jury, the penalty hearing commenced. The State called several witnesses who described Robins as an extremely violent man. In particular, Robins had severely beaten a young man who was involved in Robins' drug sales. Robins had made numerous statements to friends and associates that he would kill a police officer. Finally, there was evidence that Robins had threatened to bomb the apartment where McDowell, Brittany and another of McDowell's boyfriends were living. His stated purpose was to kill everyone in the apartment. The police were called and the situation was peacefully resolved.

4

1    McDowell concluded her testimony during the penalty phase by relating, over
2 defense counsel's objection, that her brother and uncle had received threatening notes
while she was in jail.  Robins was also in jail when the notes were delivered.

3    Additionally, there was evidence indicating Robins was substantially involved
in the sale of rock cocaine.  Evidence of one of Robins' arrests for the sale of cocaine
4 was introduced.  Robins objected to this testimony because charges were never filed.
There was also some testimony tending to connect Robins with gangs.
5
6    In his defense, Robins called several witnesses.  Generally, the tenor of the
testimony concerned not seeing Robins abuse either Brittany or other children he had
been around, his general nature and non-violent personality.
7

8  *Robins v. State*, 106 Nev. 611, 614-18, 798 P.2d 558, 560-63 (1990), *cert. denied*, 499 U.S. 970

9 (1991).

10    Robins was convicted of first degree murder and was sentenced to death on the murder

11 conviction.  *See* Exhibit 43 (ECF No. 146-4).[1][2]  He was also convicted of felony child abuse with

12 substantial bodily harm, and was sentenced to twenty years in prison on that conviction.  *See*

13 Exhibit 47 (ECF No. 146-8).

14    Robins appealed to the Nevada Supreme Court, and that court affirmed his convictions and

15 sentences on September 19, 1990.  *Robins*, 106 Nev. 611, 798 P.2d 558.  Robins' petition for

16 rehearing was denied on December 18, 1990.  Exhibits 66 (ECF No. 147) and 67 (ECF No.

17 147-1).  The Supreme Court of the United States denied Robins' petition for a writ of certiorari on

18 April 15, 1991.  Exhibit 71 (ECF No. 147-5).

19    On July 5, 1991, Robins filed, in the state district court, a petition for post conviction

20 relief.  Exhibit 80 (ECF No. 147-14).  He filed a supplemental petition in that action on

21 September 16, 1991.  Exhibit 87 (ECF No. 147-21).  The state district court denied relief.  Findings

22

23    [1] Unless otherwise noted,  in this order, the exhibits referred to by number, in the form
"Exhibit ___," are those exhibits filed by the respondents in support of their motion to dismiss
24 on January 8, 2010 (ECF No. 144-152) (Exhibits 1-235) or those filed by Robins in support of his motion
to amend and motion for stay on June 11, 2013 (ECF No. 263-266) (Exhibits 236-275).

25    [2] Because of a glitch in an early version of ECF, the attachment numbers relative to ECF filings
26 are not always consistent within ECF.  In this order, in identifying the location of exhibits, the court
refers to the attachment numbers appearing on the docket for the case (which, in some cases, is different
from the attachment numbers appearing in the headers on the exhibits themselves).

of Fact, Conclusions of Law and Order, Exhibit 97 (ECF. No. 148-1).  Robins appealed.  *See* Appellant's Opening Brief, Exhibit 107 (ECF No. 148-11).  On May 27, 1993, the Nevada Supreme Court affirmed the denial of relief on all Robins' claims but one, and, on that claim, a claim of ineffective assistance of counsel for failure of counsel to investigate and present mitigating evidence in the penalty phase of the trial, the court remanded the case to the state district court for an evidentiary hearing.  Order of Remand, Exhibit 112 (ECF No. 148-16).  The evidentiary hearing was held on January 31, February 20, March 6, March 13, and March 20, 1997.  *See* Exhibit 140 (ECF Nos. 149-14 and 149-15), Exhibit 141 (ECF Nos. 149-16 and 149-17), Exhibit 145 (ECF Nos. 149-21, 149-22, 149-23, and 149-24), Exhibit 150 (ECF No. 149-29), and Exhibit 152 (ECF No. 150-1).  Following the evidentiary hearing, on June 10, 1997, the district court denied relief.  *See* Findings of Fact and Conclusions of Law, Exhibit 153 (ECF No. 150-2).

While the evidentiary hearing was ongoing, on March 6, 1997, Robins filed, in the Nevada Supreme Court, a petition for writ of mandamus, or, in the alternative, writ of prohibition, seeking an order that the state district court allow the testimony of an expert on child abuse and "shaken baby syndrome," and introduction into evidence of exhibits related to that testimony.  *See* Petition for Writ of Mandamus or, in the Alternative, Writ of Prohibition, Exhibit 147 (ECF No. 149-26).  That petition was denied.  Order Denying petition for Writ of Mandamus or Prohibition, Exhibit 148 (ECF No. 149-27).

Robins appealed from the denial of the remanded claim.  *See* Appellant's Opening Brief, Exhibit 168 (ECF No. 150-24).  On November 24, 1998, the Nevada Supreme Court dismissed Robins' appeal, ruling that Robins' trial attorneys performed deficiently in not further researching his background and in not presenting evidence regarding it at the penalty phase of his trial, but that Robins was not prejudiced.  Order Dismissing Appeal, Exhibit 171 (ECF No. 150-27).  Robins' petition for rehearing, Exhibit 175 (ECF No. 151-1), was denied on March 17, 1999.  Exhibit 177 (ECF No. 151-3).

1    This court received Robins' *pro se* habeas corpus petition (ECF No. 5), initiating this action,

2    on April 6, 1999.  The petition was filed on May 5, 1999, after Robins was granted *in forma*

3    *pauperis* status (ECF Nos. 4, 5).  Robins subsequently filed supplements to the petition (ECF Nos.

4    7, 9).  Counsel was appointed for Robins (ECF Nos. 4, 6, 8, 10, 12, 18, 19).  Robins then conducted

5    discovery (*see* ECF No. 22, 46, 56, 62, 75, 76, 87, 91).

6    On August 30, 2004, respondents filed a motion to dismiss (ECF No. 98), arguing that

7    Robins' amended habeas petition contained claims not exhausted in state court.  Robins responded to

8    the motion to dismiss with a motion for stay (ECF No. 101), requesting that this action be stayed to

9    allow him an opportunity to return to state court to exhaust claims.  On January 21, 2005, the court

10   denied the motion to dismiss and granted the motion for stay (ECF No. 104).  Then, on

11   March 14, 2005, after Robins filed a second amended habeas petition (ECF No. 105) containing

12   what were purported to be only exhausted claims, the court stayed the action pending Robins' further

13   exhaustion of claims in state court (ECF No. 106).

14   On May 11, 2005, Robins filed his second state-court petition for a writ of habeas corpus.

15   Exhibit 180 (ECF No. 151-6, 151-7, 151-8).  The state district court dismissed that petition on

16   procedural grounds.  *See* Findings of Fact, Conclusions of Law and Order, Exhibit 199 (ECF No.

17   151-28).   Robins appealed, and the Nevada Supreme Court affirmed.  *See* Order of Affirmance,

18   Exhibit 228 (ECF No. 152-29).  Robins' petition for rehearing was denied on May 19, 2009.  *See*

19   Order Denying Rehearing, Exhibit 234 (ECF No. 152-35).

20   On June 23, 2009, the stay of this federal habeas corpus action was lifted.  Order entered June

21   23, 2009 (ECF No. 126).   On September 22, 2009, Robins filed a third amended habeas corpus

22   petition (ECF No. 133).

23   On January 8, 2010, respondents filed a motion to dismiss the third amended petition

24   (ECF No. 143).  On August 11, 2010, the court granted that motion in part and denied it in part (ECF

25   No. 180).  The court dismissed Grounds 9 through 24 of Robins' third amended petition on

26

grounds of the statute of limitations and the procedural default doctrine, leaving Grounds 1 through 8 of the third amended petition to be decided on their merits.

On January 28, 2011, respondents filed an answer (ECF No. 187), responding to Grounds 1 through 8 of the third amended petition.

On September 29, 2011, after she unreasonably delayed filing Robins' reply, the court discharged Robins' counsel, Patricia Erickson, and appointed new counsel, the Federal Public Defender for the District of Nevada.  Order entered September 29, 2011 (ECF No. 204); Order entered October 5, 2011 (ECF No. 205).  On July 18, 2012, the court granted a motion to withdraw filed by the Nevada Federal Public Defender, and appointed the Federal Public Defender for the District of Arizona to represent Robins.  Order entered July 18, 2012 (ECF No. 221).

On June 11, 2013, now represented by the Arizona Federal Public Defender, Robins filed his "Motion for Leave to File Fourth Amended Petition for Writ of Habeas Corpus" (ECF No. 262) ("motion to amend"), with his proposed fourth amended petition (ECF No. 262-1) attached as Exhibit A.  On June 11, 2013, Robins also filed his "Motion for Stay and Abeyance" (ECF No. 268) ("motion for stay").  On August 26, 2013, respondents filed an opposition to the motion to amend (ECF No. 277), and an opposition to the motion for stay (ECF No. 275).  On September 26, 2013, Robins filed a reply in support of his motion to amend (ECF No. 283)[3], and a reply in support of his motion for stay (ECF No. 285).

Motion to Amend

Under Federal Rule of Civil Procedure 15(a), a party may file an amended petition more than 21 days after a responsive pleading is filed, only with leave of court or the opposing party's consent. Fed. R. Civ. P. 15(a)(1) and (2).  The respondents oppose Robins' motion to amend; therefore, leave

---

[3]  At 28 pages, the reply in support of the motion to amend exceeds the 20-page limit for such documents set forth in Local Rule 7-4.  Robins properly filed a motion for leave of court to file the 28-page reply (ECF No. 284).  The court finds that there is good cause for Robins to exceed the 20-page limit with regard to the reply in support of the motion to amend, and will, accordingly, grant Robins' motion for leave of court to do so.

of court is required.  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).

In *Foman v. Davis*, 371 U.S. 178, 181-82 (1962), the Supreme Court interpreted the statutory mandate that leave to amend should be freely-given when justice so requires as a limit on the district court's discretion.  The Court stated, "the Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and ... accept[ed] the principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Foman*, 371 U.S. at 182 (*quoting Conley v. Gibson*, 355 U.S. 41, 48 (1957) (internal quotation marks omitted)). Permissible justifications for denial of a motion to amend include: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposition; (4) repeated failures to correct deficiencies with previous amendments; and (5) futility of the amendment.  *Id.*; *see also Anthony v. Cambra,* 236 F.3d 568, 577 (9th Cir.2000);  *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir.1995).

The fourth amended habeas petition would, most significantly, present four claims that are wholly or partly new:  Claims 6, 7, 11, and 25.  Claim 6 is a completely new claim of ineffective assistance of trial counsel.  Fourth Amended Petition, pp. 17-54.  Claim 7 is a claim of ineffective assistance of trial counsel with a newly added theory, based on new evidence.  *Id.* at 55-99.  Claim 11 is a completely new claim based on the doctrines established in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).  *Id.* at 134-49.  Claim 25 is a new cumulative error claim.  *Id.* at 164.  Robins admits that Claims 6, 11, and 25 are unexhausted in state court (*see* Fourth Amended Petition, pp. 17, 134 (regarding Claims 6 and 11); Motion for Stay (ECF No. 268), p. 4 (regarding Claim 25)), and he concedes that Claim 7 is at least arguably unexhausted (*see* Reply in Support of Motion for Leave to File Fourth Amended Habeas Petition (ECF No. 283), pp. 2, 27; *see also* Fourth Amended Petition, p. 55 (stating Claim 7 "has not been exhausted in state court").

In Claim 6 of his fourth amended petition, Robins claims that his trial counsel was ineffective for failing to adequately investigate and present evidence regarding the cause of Brittany Smith's death, as well as the cause of apparent injuries she suffered prior to her death.  Fourth Amended

Petition, p. 17. Robins claims that, when she died, Brittany "suffered from the devastating effects of scurvy, Vitamin C depletion (Barlow's Disease), and that this condition was the predominant required causative factor in her death." *Id*. According to Robins, scurvy provides an alternative explanation – besides physical abuse – for a prior fracture of Brittany's femur and for the hemorrhaging in various parts of her body that were discovered after her death. *Id*. at 27-31. Robins submits, in support of Claim 6, the declarations of Patrick D. Barnes, M.D, a radiologist. (Exhibit 262) and Dr. John Plunkett, M.D., a general and forensic pathologist (Exhibit 265). Dr. Barnes states that Brittany's x-rays "revealed multiple classic images typical of those seen in children with scurvy (Barlow's Disease)." Exhibit 262, p. 5, ¶15. Dr. Barnes states that "the radiographic images of the fracture to Brittany Smith's right leg (as well as images of her left leg, not associated with any fracture) are highly suggestive of vitamin C deficiency/depletion with scurvy (Barlow's Disease)." *Id*. at p. 3, ¶9. Dr. Barnes also states that "[i]f left untreated, scurvy can lead to death." *Id*. at p. 8, ¶24. Dr. Plunkett states that it appears that "scurvy was both a significant and possibly the required causative factor" in Brittany's death. Exhibit 265, p. 6, ¶14. Dr. Barnes states that by 1988 the signs of abnormal bone formation and deterioration associated with scurvy were "well documented in the medical literature and had been for many decades." Exhibit 262, pp. 5-6, ¶16.

The court finds Claim 6 to be a colorable claim of ineffective assistance of counsel, going to the question of Robins' guilt or innocence, as well as to the propriety of his death sentence. As such, the court finds that the interests of justice weigh in favor of allowing Robins to amend to add this claim.

Brittany Smith died 25 years ago. This habeas corpus action is over 14 years old. The court has long been concerned about the age of this case. It is late for an amendment adding completely new claims to Robins' petition. However, Robins makes a detailed, colorable showing that any delay in this regard can be attributed to unprofessional conduct and ineffective representation of him by his former counsel, Patricia Erickson, and should not be attributed to Robins himself. *See* Motion for Leave to Amend (ECF No. 262), pp. 4-30. The court does not here make any ruling, or suggest

any opinion, with respect to whether Erickson's performance is such as might excuse any procedural

default, or any limitations bar, that might exist as a result of Robins' delay in discovering and

proffering Claim 6, but the court does find that Robins' showing regarding Erickson's performance

is sufficient to support a finding that there has been no undue delay, bad faith, or dilatory motive.

Moreover, given the nature of this case, and the nature of the allegations in Claim 6, respondents will

not be unduly prejudiced by the filing of the fourth amended petition.  The court will grant the

motion to amend.[4]

Motion for Stay

Robins' fourth amended habeas petition is a "mixed petition," meaning it contains both

exhausted and unexhausted claims.  In the motion for stay, Robins requests that the court stay this

case while he exhausts the unexhausted claims in state court.  *See* Motion for Stay, pp.  5-6.

A federal court may not grant habeas corpus relief on a claim not exhausted in state court.  28

U.S.C. § 2254(b).  The exhaustion doctrine is based on the policy of federal-state comity, and is

intended to allow state courts the initial opportunity to correct constitutional deprivations.  *See*

*Picard v. Conner*, 404 U.S. 270, 275 (1971).  To exhaust a claim, a petitioner must fairly present the

claim to the highest state court, and must give that court the opportunity to address and resolve it.

*See Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*); *Keeney v. Tamayo-Reyes*, 504 U.S. 1,

10 (1992).

In *Rhines v. Weber*, 544 U.S. 269 (2005), the United States Supreme Court circumscribed

the discretion of federal district courts to impose stays to facilitate habeas petitioners' exhaustion of

claims in state court.  The *Rhines* Court stated:

> [S]tay and abeyance should be available only in limited circumstances.  Because
> granting a stay effectively excuses a petitioner's failure to present his claims first to
> the state courts, stay and abeyance is only appropriate when the district court
> determines there was good cause for the petitioner's failure to exhaust his claims first
> in state court.  Moreover, even if a petitioner had good cause for that failure, the
> district court would abuse its discretion if it were to grant him a stay when his

---

[4]  Given the court's views regarding Claim 6, the court need not analyze the motion to amend, or for that matter the motion for stay, with regard to Claims 7, 11, and 25 of the fourth amended petition.

11

1  unexhausted claims are plainly meritless. *Cf.* 28 U.S.C. § 2254(b)(2) ("An application
2  for a writ of habeas corpus may be denied on the merits, notwithstanding the failure
   of the applicant to exhaust the remedies available in the courts of the State").

3  *   *   *

4  [I]t likely would be an abuse of discretion for a district court to deny a stay and to
   dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his
5  unexhausted claims are potentially meritorious, and there is no indication that the
   petitioner engaged in intentionally dilatory litigation tactics.  In such circumstances,
6  the district court should stay, rather than dismiss, the mixed petition.

7  *Rhines*, 544 U.S. at 277-78.

8      *Rhines* does not state, or suggest, that every unexhausted claim in the petition must satisfy,

9  individually, the "good cause" and "potentially meritorious" requirements before a stay is permitted.

10 If a stay is warranted with respect to any single claim, the court need not conduct a claim-by-claim

11 analysis regarding the remaining claims.

12     In his motion for stay, incorporating argument from his motion to amend, Robins asserts that

13 his previous counsel, Patricia Erickson, acted in an unprofessional manner, and was ineffective, and

14 that "he has good cause for his failure to exhaust his new claims based on [her] ineffectiveness and

15 egregious professional misconduct ...."  Motion for Stay, pp. 5-6 (referencing Motion to Amend,

16 pp. 4-29, 73-74, and 95-97).  Robins continues:  "At the same time Petitioner also shows that any

17 delay in the bringing of the new claims was caused by Ms. Erickson's unprofessional conduct;

18 actions not endorsed by the Petitioner."  *Id.* at 6.  He concludes:  "The showing that his failure to

19 exhaust is the fault of his state postconviction counsel satisfies the *Rhines* good cause requirement."

20 *Id*.

21     In *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), the Supreme Court held that "[w]here, under

22 state law, claims of ineffective assistance of trial counsel must be raised in an initial-review

23 collateral proceeding, a procedural default will not bar a federal habeas court from hearing a

24 substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there

25 was no counsel or counsel in that proceeding was ineffective."  *Martinez*, 132 S.Ct. at 1320.  While

26 the *Martinez* decision did not deal directly with the issue of good cause for a failure to exhaust, its

12

1  holding, with respect to the issue of good cause for a procedural default, concerns a similar issue,

2  and is analogous and instructive.

3          The *Rhines* opinion does not describe in detail what constitutes good cause for failure to

4  exhaust, and the Ninth Circuit has provided no clear guidance on that question, beyond holding that

5  the test is less stringent than an "extraordinary circumstances" standard.  *See Jackson v. Roe,* 425

6  F.3d 654, 661-62 (9th Cir. 2005) (citing *NLRB v. Zeno Table Co.*, 610 F.2d 567, 569 (9th Cir.

7  1979)).  Many district courts have concluded that the standard is more generous than the good-cause

8  showing needed to excuse a procedural default.  *See*, *e.g.*, *Rhines v. Weber*, 408 F.Supp.2d 844, 849

9  (D.S.D. 2005) (applying the Supreme Court's mandate on remand).  This view is supported by the

10 Supreme Court's opinion in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), where the Court

11 acknowledged that a petitioner's "reasonable confusion" about the timeliness of his federal petition

12 would generally constitute good cause for his failure to exhaust state remedies before filing his

13 federal petition.  *Pace*, 544 U.S. at 416-17.  In light of this precedent, and especially in light of

14 *Martinez*, the court concludes that ineffective assistance of counsel in initial-review collateral

15 proceedings, in failing to raise a substantial claim of ineffective assistance of counsel at trial, may

16 establish cause for the failure to exhaust that claim.

17         In Nevada, a claim of ineffective assistance of trial counsel generally must be made, in the

18 first instance, in a first state habeas action.  *See Corbin v. State,* 111 Nev. 378, 381, 892 P.2d 580,

19 582 (1995) ("[T]his court has consistently concluded that it will not entertain claims of ineffective

20 assistance of counsel on direct appeal.").  The court agrees with Robins that, in light of *Martinez*,

21 and the other caselaw cited above, he has shown good cause under *Rhines* for his failure to exhaust

22 the substantial ineffective assistance of trial counsel claim set forth in Claim 6 of his fourth amended

23 petition.  The court finds, further, that Claim 6 is at least potentially meritorious.  And, there is no

24 indication that Robins has ever engaged in intentionally dilatory litigation tactics.  Therefore, the

25 requirements for a stay of this action pending exhaustion of Robins' claims in state court, as set forth

26 in *Rhines*, are satisfied.

1    The court will grant Robins' motion for stay, and stay this action.  In exercising its discretion

2 to grant the stay, the court takes into account the effect of *Crump v. Warden*, 113 Nev. 292, 934 P.2d

3 247 (1997), under which, it appears, there is at least a possibility that the Nevada courts may

4 consider, on their merits, Robins' unexhausted claims, including the unexhausted claim set forth in

5 Claim 6.  Moreover, the court takes into account the nature of Claim 6:  a colorable claim that

6 Robins is actually innocent and that his death penalty was improperly imposed.

7    The court's intention is that this will be the last time that the court imposes a stay to facilitate

8 Robins' exhaustion of claims in state court.  Robins must exhaust *all* of his unexhausted claims in

9 state court during the stay imposed pursuant to this order.

10    **IT IS THEREFORE ORDERED** that petitioner's Motion to File Pleading in Excess of

11 Twenty Pages (ECF No. 284) is **GRANTED**.  Petitioner is granted leave of court to file his 28-page

12 reply in support of his motion to amend.  As that document has already been electronically filed, the

13 Clerk need take no further action in this regard.

14    **IT IS FURTHER ORDERED** that petitioner's Motion for Leave to File Fourth Amended

15 Petition for a Writ of Habeas Corpus (ECF No. 262) is **GRANTED**.  Petitioner is granted leave of

16 court to file his fourth amended habeas petition.  The Clerk of the Court shall separately file

17 petitioner's fourth amended habeas petition, a copy of which is attached as Exhibit A to petitioner's

18 motion to amend (ECF No. 262).

19    **IT IS FURTHER ORDERED** that petitioner's Motion for Stay and Abeyance (ECF No.

20 268) is **GRANTED**.  This action is **STAYED** to allow petitioner to exhaust, in state court, all his

21 unexhausted claims for habeas corpus relief.

22    **IT IS FURTHER ORDERED** that, on or before **December 15, 2013**, petitioner shall file

23 and serve a status report, describing the status of his state-court proceedings.  Thereafter, during

24 the stay of this action, petitioner shall file such a status report every 6 months (on or before

25 June 15, 2014; December 15, 2014; etc.).  Respondents may, if necessary, file and serve a response

26

to any such status report within 15 days after its service.  If necessary, petitioner may reply within 15 days of service of the response.

IT IS FURTHER ORDERED that, following the conclusion of petitioner's state court proceedings, petitioner shall, within **30 days**, make a motion to lift the stay.

IT IS FURTHER ORDERED that this action shall be subject to dismissal upon a motion by respondents if petitioner does not comply with the time limits in this order, or if he otherwise fails to proceed with diligence during the stay imposed pursuant to this order.

Dated this 4thday of November, 2013.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

15